The next case for argument is 23-1193 Tribal Two v. Vidal. Mr. Klein, I'll split your time, 8 and 7. Whatever works for you, Your Honor. As long as I have some time reserved. All right. Good morning, Your Honors. If it may please the Court, in reviewing the briefing in preparation for today, it occurred to me that while our briefs identified multiple errors that the Board stumbled through as it was going through its analysis, there's actually one particular point which permeates the analysis from start to finish and provides a useful through line and framework for analyzing most, if not all, of the issues. And that is the Board's decision to acknowledge, and it wasn't even an express decision, but to acknowledge that both the application and the registrations did not claim color. They claimed the marks in the description without a claim of color. But in the Board's analysis, the Board seemed to approach each of these issues as if it was a black and white claim in each of the application and the registrations, and that it was limited to a black and white depiction. And I think that in many senses influences and at points moots some of the arguments that we've had with the Director about what the Board can and cannot determine and consider in its analysis. And you pick an explicit example of a Board error that likely turned on its thinking that this was black and white as opposed to color? I think... That's where the rubber hits the road on your general theory. Sure. I think if you look at the Board's determination about applicants' Eric Hodges mark, they said, well, you can discern letter T's if you look for them, but we don't think the letter T's are dominant. And I think if the ability to depict the mark in different colors, including the different elements in different colors, which would allow for you to emphasize the letter T's and de-emphasize the two separate horizontal lines. I guess, did you present this argument to the Board or in your briefs? Yes, we talked about how the Board considered, overlooked, I'm sorry, the color claims. We have some examples at page 22 of your blue brief, but did you make that argument and show that type of example to the Board? I did not know whether or not the... I know the examples weren't presented. They're illustrative. Were or were not? Were not. Those are illustrative examples. Those are not. So I think if I understand the argument correctly, you're asking us to decide based on examples like the ones at page 22 that one could use this mark to really emphasize through different color and shading the T's in tribe of two and make it look more clearly like two capital T's, one inverted, than perhaps seen as the Roman numeral two. But if I'm understanding you correctly, that is not at all an argument that you ever made to the Board. You didn't say, here's what we want you to analyze, these types of color arrangements, for example. Well, I believe before the Board, it was pointed out that the marks do not claim color, as the Board noted. And it's just as a mark which is in standard characters is construed without respect to stylization, font, or color, that one has to take into account all the different variations. But are you saying the law required the Board to think through in its own mind all the different myriad color schemes that would be possible and how that would affect consumers and whether they might see an abstract design or a Roman numeral or two T's? I think it has to take that into account, just as when, again, comparing standard character marks, it has to take into account the fact that they can be shown in different stylizations. And when you're, for example, comparing, like in Vetera, the case we cite in Arboreus, when you're comparing a stylized mark to a standard character mark, it's proper to consider whether or not one letter gets larger, more emphasis than the rest of the letters. I think it's part and parcel of what can be considered and what can't. Well, I mean, you refer to not just colors, but contrasting colors and shadings, or shadings. So those are innumerable. So what was the Board supposed to do, or did you make an affirmative argument that, look, this looks different on this particular shading or on this particular color, and that the Board didn't address it right? Did you make that argument that this looks different, the result might be different if you consider various shadings and colors? And did you give them any examples or put in any evidence with regard to that? I think the answer is no. There was no expressed argument that the Board should specifically consider different shadings. Okay, so that's a problem here for us on appeal, to find error or problems with the Board's analysis when the argument was not made to it, right? Well, the Board did identify the fact that these are all applications and registrations that lack a color claim. And so I think the Board has to take that into account in making its decision. I don't think it can disregard the different colors. And how was it supposed to address the innumerable types of variations of colors and shadings? I mean, go through all of them, go through none of them, and make it a conclusory statement? I don't know how the Board could have addressed in more detail an argument which I think you're saying you really didn't make to it. And why it's lacking. Yeah, I think the Board could have acknowledged that there are ways that the marks similarities could be emphasized. As I understand it, you're saying that where it is indicated that the application or the marking question aren't color limited, then there is a corresponding obligation on the Board to open the question and then query to itself whether coloring would matter as to the prominence of one letter or the prominence of the gap, which led to the conclusion that Erotage was essentially an abstract design. I think you're telling us that you'd like us to write an opinion that says when this color issue is involved, the Board, even if it isn't presented to them by the parties, the Board has an obligation to delve into that because it could be important. Your Honor, I think that's fair. Can you cite any authority, though, that exists that puts that obligation on the Board and allows us to say it's reversible error if the Board doesn't, sua sponte, undertake an analysis of all the innumerable ways you might have made the Ts more prominent? I don't think it requires an analysis of all the different ways. I think certainly the Vetera case and its discussion of Citigroup about how the Board can't limit the different variations which are permissible based on reasonable manners of display, for example. The Board has to consider all the different permissible variations in making its decisions. Let me see if I understand what your argument is. It has to consider variations of shades and colors, which could be innumerable, and it has to consider your mark having those and the other mark not, or that both of them have the same. Do we have to go into every variation where one has the shading and color and the other doesn't, or has a different shading and color? It seems like this is an innumerable analysis. I think if there's a case to be made or one thinks there's a case to be made with regard to differentiating certain colors or shadings, then I think if you make that case, the Board is in a position to address it. But I'm not sure if I was sitting at the Board what on earth or what I could do with the innumerable different examples with no argument made as to what the distinctions are. Is that fair enough? Oh, I agree. I don't think the Board has to go through innumerable variations. I think it just considers whether or not the same colors or shadings and emphasis can be found in both marks, creating similarities, emphasizing the similarities between the two, deemphasizing the differences. Well, do you want to make a few other arguments in your remaining time because you're already in rebuttal? I'm happy to reserve time and respond to any questions. Okay, thank you. Well, you were able to hear the preceding argument, correct? Yes. Please proceed. Sure. Good morning, Your Honors. My name is Mike Chihon on behalf of the USPTO Director. Quickly, on this issue of color, the Board knows how to compare marks with no color claim. There's no indication that it did. It didn't need to say that it did, particularly because, as Your Honors recognize, it doesn't seem that Tribe of Two presented the argument this way to the Board. Beyond that, it doesn't make a difference. Even if the applicant's mark is colored, if Eric Taja's mark is colored in some particular way, we can't say in a particular way, but it doesn't stop being a rectangular geometric design. For all the reasons that the Board gave, which were based on substantial evidence, namely the way the mark looks, on page 16 of its opinion, it said it found the commercial impression of the applicant's mark based on, quote, the inversion of the letters T, the double horizontal lines, and the use of negative space to create a rectangle. Are you saying that color could never make a difference in terms of the assessment of whether it was designed? There's just as many color schemes that maybe could make the T's less discernible and make... If you picked a really, really bright color for the T's, for the things that form the edges around the empty space, the eye would be more attracted to the bright color than it would be to the empty space. Right? If, let's imagine that... I raised the question because I understood your argument to be that it wouldn't make any difference to whether or not this was an abstract design regardless of color, and I just was questioning that in my mind. Well, the tribe of two, this is an opposition. The burden was on tribe of two to establish a likelihood of confusion. It put no evidence into the record that any particular color scheme would alter consumer perception. I just would have thought your argument with respect to the color would be that color is irrelevant in this case because the advent didn't make any issue of color, and so we didn't need to hypothesize whether color could matter or could not matter. Exactly, Your Honor. When you ventured into the merits to say that you thought color would never make any difference, I questioned you. I understood, Your Honor. Now you've agreed that color could make a difference in terms of deciding whether or not ertage was an abstract design. It doesn't take away from what the court said based on the way the mark looks, which was the evidence before it. Well, I understood your response to be, so maybe I misunderstood, that we don't know whether color makes a... If there's an argument to be made that color makes a difference, then the argument has to be made so one can address whatever conceivable argument there might be. Right, exactly. That was my point, that the trial of two, to the extent it wants to pursue this argument, didn't make the record. It needed two. Well, why isn't it, as was suggested by your friend on the other side, that the board has a sua sponte obligation if faced with both an application that's not limited in color and an opposition mark that already exists that's not limited in color, why is it not the board's obligation to think through whether color might make a difference? And it does seem like color could make a difference. The examples given in the blue brief at 22, to me at least, no longer look like one might perceive them as the Roman numeral two as opposed to two Ts. So why doesn't the board have that obligation that is being suggested, at least in argument today? There's no indication that the board didn't do that. The board noted that this application has no color claim and the registrations have no color claim. There's no indication that the board didn't consider this and quite frankly, Your Honor, it didn't need to because trial of two didn't raise it. I don't think you're answering Judge Stark's question. Judge Stark asked you whether the board, what's your response to your adversary's argument that the board has a sua sponte obligation to delve into this matter? My response is that to the extent it does, there's no indication that the board didn't do that. What do you mean to the extent it does? Does the board have an obligation, sua sponte? Yes, Your Honor. It has an obligation when there's no color claim to consider that. There's no indication that it didn't do that here and it didn't need to say that it did because trial of two didn't raise it. Well, is any part of the board's analysis, which I think is largely page 15 through 17, did any of that analysis deal with color? I mean, did it reference the color black of these Ts or did it rely on anything relative to color? I mean, it relied on, I saw it relying on shapes and placement, etc. It didn't look like there's anything in what they said that was predicated on the color or a particular color. Is that fair? Yeah, that's right, Your Honor. And I think that's the result of the way trial of two presented the argument below. Well, at least the impression of a rectangular geometric design didn't suggest to me that that would change or be different if there were a color thing. With respect to the two tribes, I guess I don't see anything they said. They talked about the Roman numeral two and the letters T. I guess I didn't see anything that suggested that there's a color emphasis on any of this. Yeah, that's right, Your Honor. Well, you do more of these cases than I do because we don't get very many. I mean, when you have an issue with regard to marks, I haven't seen one that deals with this variation of colors. Do you know of any cases that have gone that route? Not right here. Off the top of my head, Your Honor, one where I don't believe trial of two recited any and it's briefing and it mentions the Viterra case, but we would have to see if that took up that issue. And quite frankly, Your Honor, I think trial of two is turning to this color argument because this is a straightforward likelihood of confusion case. The board's dissimilarity finding was based on substantial evidence and the weight it gave to these findings when it balanced the DuPont factors, it was reasonable given the differences it saw, and it was proper under this court's precedent. We walked through the substantial evidence supporting the dissimilarity finding was the marks themselves, the way they appear in the application and in the registrations. We walked through where when the board made its finding about the commercial impression of the applicant's mark, it was referencing the elements in their arrangement. It did so as well when it made its findings about the possible commercial impressions of trial of two's mark. On page 15, we see at the beginning of the bottom paragraph that the court mentions the two letters T juxtaposed in an inverted position to each other. Can I ask a question, please? Can you cite another case? This case strikes me as unusual in at least one respect in which all of the relevant DuPont factors except for similarity of the marks pointed to a likelihood of confusion. Right? Yes. Can you think of another case similar to this in which all of the DuPont factors point to a likelihood of confusion except for similarity and yet the similarity of the marks overwhelm the other factors? Yes. We cite several of them on page 18 of our brief, Your Honor. The Coke Trip case, the Oakville Hills Cellar case, the Odom Tennessee Pride case, the Champagne case, and the Kellogg case were all cases where the single factor of dissimilarity outweighed all the other DuPont factors. And this court found nothing improper in any of those cases. The Crook Trip case is probably the most recent example. In there, the court looked at how the board balanced the factors and asked itself whether there was any error in the way in doing so, in giving the factor dispositive weight. And they said, no, there was no error. So then the board, on its de novo review, drew the same balance and affirmed. And we asked that the court do the same here. Mr. Chihon, it looks like, I could be mistaken, but it looks like the board repeatedly produced incorrectly the tribe of two mark. That is, whether the inverted T should be on the left or on the right. And I'm pretty sure that your friend on the other side calls this out in the briefing. Do you agree that there is error in how the board reproduced the opposers' marks? And if so, why shouldn't that lead to a remand, since this analysis is so focused on what the visual impression is of the mark? Wouldn't we expect the board to get the mark right when it reproduces it in its opinion? Yeah. Unfortunately, Your Honor, the board did make that mistake. But at least I'm looking at page 14 of the opinion, where it sets out the marks right before its dissimilarity findings. And there, they appear correctly. So I think it would be a bit of a... I don't think we can read into the other places where the mark was misrepresented as any sort of indication that the board didn't base its dissimilarity finding on the way that the mark appears in the registration. But then I guess you would have to agree that, for instance, on page 11, the board got it wrong in how it reproduced it, right? Yes, yes, yeah. And I think there may be a few other instances. Because of the well-supported factual finding and of the proper balancing of the DuPont factors, Tribal 2 argues that the board made certain legal errors, that it failed to consider the marks in their entirety and performed an improper side-by-side comparison. But very quickly, Tribal 2 is wrong on both counts. The board based its dissimilarity finding based on the marks in their entirety, that it considered all aspects of how the mark looks and the arrangement of elements. Tribal 2 argues that the board should have considered the sound and connotation of the two letters T. But at least for Applicant's Mark on page 16, the board says, quote, we disagree that Applicant's Mark will be perceived as stylized letters. So if consumers don't see letters, there's no letters for them to sound out. There's no letters that will have connotation as letters. The board said that the literal elements, the letters do not form the dominant impression. That's on 16 there at the top as well. That finding was based on the evidence we walked through. So the Ts don't contribute to the commercial impression beyond their role in this overall design. We know from cases like ATV that when one mark has no literal elements, no spoken, vocalized element like this, the analysis turns on visual similarity only. So the board did a full analysis here. On this notion of a side-by-side comparison, the prohibition is putting the marks side-by-side and asking if they can be distinguished based on their precise details. And the board didn't do that. It looked at each mark separately, independently, and determined what their commercial impression is. It did so on page 15 for a tribe of two's marks. Then it turned to the Applicant's Mark on page 16. And then at the bottom of 16 over to 17, it compared those general impressions, not the minute details. So this notion of an improper side-by-side comparison is not there. And I think that's why, perhaps, we turned to this color issue from the get-go. It seems like the starting point here may determine the outcome. And the question is whether one or both of the marks are stylized letter marks or are instead design marks. Is that an initial question? Is that a question of law or a question of fact? Where do you start? Do I have letter marks or do I have design marks? Is that decided as a matter of law or a matter of fact? That sounds like an issue of fact, Your Honor. And the board didn't improperly presume that these are design marks. When letters are presented in some way other than letters are normally presented, as they appear printed on paper, for example, then the question becomes, do they retain their meaning? Are they still perceived as letters? At that point, we're in, if you will, design mark land. And that's consistent with how Tribe of Two presented the case, Your Honor. If you look at their Notice of Opposition, it's in the Joint Appendix. Let me find the case. I think it's 46. In its Notice of Opposition, Your Honor, if you turn to Appendix 46, Paragraph 6, Tribe of Two called these design marks from the get-go. They're on Paragraph 6. Since as early as 2012, the opposer has substantially, exclusively, and continuously used the two trademarks, Tribe of Two, that's the word mark, and the following design marks. And it lays out both of the registered marks. In the parenthetical, it defines this as the design marks collectively referred to as the TT logo. So in its decision, Your Honor, on page 15, where the board is referring to the design elements and reference, it's just answering the question that Tribe of Two presented to it from the very beginning. So beyond that, Your Honor, the disagreements that Tribe of Two raises are disagreements about the facts that the board found. They're not challenges to the evidence. So unless the board has any further questions, Your Honor, we rest on our briefs and yield our time. Thank you. Thank you. Thank you, Your Honors. I'll begin, actually, by pointing out that we did cite an additional case, directly on point, on the range of colors, and that's the In Re Data Packaging Corp on page 22, 453F2nd, 1300, where at 1302, the Court of Customs and Patent Appeals says that clearly a registration envisions use of the mark not only in any form of type but in printing in all the colors of the spectrum. It seems to be well established that a single registration of a word mark may cover all of its different appearances. Potential is actual. Similarly, there's no reason why an applicant should not be able to obtain a single registration of a design mark covering all the different colors in which it may appear. That is to say, not limited to a particular color. Well, can I ask you, how does that work? Let's assume that the Board went through sua sponte, all variations, and they said, okay, we find one that has two letters in the two of tribes, one hot pink and one yellow, and we think that meets the test, versus another mark that's... So is that what your registration is then condensed to? How does that work? No, I think it works because when... And it also plays into the dominance determination. So basically, you look at whether or not the presented options, whether or not they can be... whether or not the mark without the claim can be displayed in a manner which is similar to or identical to the mark it's being compared with. And so the question is, is there an overlap? You don't have to go through, well, in this color, it's the same, or this color's different. If there's no overlap, then they're not going to be similar or the same in any. But if there is an overlap, you have to take that into consideration, and you can't discount it. You can't literally write it out of the registration. No, I guess maybe I didn't make myself clear. Maybe the question doesn't make any sense. But what if you find that if you have to sui sponte, look at all variations of shading and colors, and you come up with one, and you say, hey, this might make a difference, is the mark then limited to the stuff that's dissimilar enough or similar enough? No, but for purposes of likelihood of confusion, it falls within the broad breadth of the senior user's mark. But if you're saying likelihood of confusion, then how do you discern whether nobody has ever produced anything like this in this color? So there's no likelihood of confusion. I mean, I don't know how you would then apply it to likelihood of confusion. If you're talking about somebody never using a particular shading and color that passes muster, then what if, don't you have to show that that's the predominant use of it to figure out whether or not there's going to be confusion in the marketplace? With due respect, that's in the TERRA and the Citigroup case, using the analogous situation of the standard character mark, which is just the word, which can be displayed in any font stylization or color, you're not required to limit it. But in this context, the burden was on you as the opposer to show likelihood of confusion, was it not? Correct. So wasn't the burden on you with this color situation to at least show the board one example, just even one example? Maybe our Ts are black and white, but the Erotage mark is all black. So however it is, their Ts are black and white also, I guess, would be your best case for confusion. Didn't you have an obligation to make some kind of showing like that to meet your burden? If that's your argument. I don't believe there is, because that sounds like the reasonable manners test, where the court has already rejected the suggestion that you have to show, make a showing that the mark is, that the variant that would cause confusion is a reasonable manner of display. And you can't limit it before doing the likelihood of confusion test. Well then, if you would answer this, I think I understood part of the response from the government to be, there's no reason to assume that the board did not think through all the different color schemes that were possible and simply find against you. Shouldn't we just assume that the board has done that work? Well, they couldn't have in their determination that the Erotage mark, you can discern the letter Ts, but that's not the dominant pressure. Because if you could, as I believe your Honor noted, if the Ts can be emphasized and that, and in doing that deemphasizes the rectangular geographic shape, then you can't say it's the dominant pressure. You can't exclude the other if they are taking account color. So I think that's the answer now. Yeah, but aren't you saying you, in response to Judge Jordan, you're saying you didn't have any burden. That's the way I understood it. Judge Stark was saying, didn't you have some obligation to point out to the board, hey, if you use certain coloring on the Ts in Erotage, you're going to minimize the design. So the question, you had a burden. In this case, apparently nothing was said to the board. Your argument was that the board's corresponding had the obligation to delve into this. And the patent office, much to my surprise, agreed with you that the board has an independent obligation. And I think what Judge Stark was asking was, even if that is so, does that obligation need to be triggered in a given case by some motion on your side? I think the comparisons we did of the elements combined with pointing out, as we did in the record, that there's no claim to color and the board's acknowledgement of that, it's a fact in the record. The board can't ignore the fact that there's no claim in color in doing its analysis. It has to take that into account. Okay, we're out of time. Thank you. Thank you both sides for cases submitted. Thank you. Thank you.